**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| WALTER H. MEDLEY and BOBBYE MEDLEY, | |
| Plaintiffs, | Civ. No.  07-01580 (DRD) |
| v. | **O P I N I O N** |
| FREIGHTLINER CORP.; FREIGHTLINER, L.L.C.; and PENSKE TRUCK LEASING, | |
| Defendants. | |

*Appearances by:*

Todd J. Leonard, Esq.
LEONARD & LEONARD PA
155 Morris Avenue
Springfield, NJ 07081

     *Attorneys for Plaintiffs*

Mary O'Keefe Massey, Esq.
HANLON, BOGLIOLO & HANLON, LLP
523 Raritan Center Parkway
P.O. Box 617
Edison, NJ 08837

     *Attorneys for Defendant*s

**DEBEVOISE, Senior District Judge**

     Plaintiffs, Walter Medley ("Walter") and Bobbye Medley ("Bobbye") (collectively "the

Medleys"), allege that Walter was injured after falling off of the battery box of a tractor trailer truck cab. The tractor was manufactured by Defendants, Freightliner Corporation and/or Freightliner, L.L.C. ("Freightliner"), and sold to CBF Trucking ("CBF"), Walter's employer, by Defendant, Penske Truck Leasing ("Penske"). Walter has asserted a product liability claim under the New Jersey Product Liability Act, a negligence claim and a breach of implied warranty claim against Freightliner and Penske. Bobbye, Walter's wife, also seeks compensation from Defendants for deprivation of Walter's usual services, earnings, society, companionship, and consortium.

Penske now moves for summary judgment on the grounds that (1) negligence and breach of implied warranty are subsumed in the New Jersey Product Liability Act and (2) that Penske as a product seller, is shielded from liability by § 2A:58C-9 of the Act. Because the New Jersey Product Liability Act is the exclusive remedy for product liability claims arising out of product use, Penske's motion for summary judgment will be granted on the Medleys' negligence and breach of implied warranty claims. However, because questions of fact exist as to whether or not Penske knew or should have known about the tractor's alleged defect, Penske's motion for summary judgement will be denied as to the Medleys' product liability claim.

## I.  BACKGROUND

Freightliner manufactures tractor trailer truck cabs. Freightliner manufactures these vehicles for customers directly, for major leasing companies, such as Penske, and for its own dealerships**.** Freightliner designs and manufactures model FLD 120 tractors. The model FLD 120 tractor that Walter was using when he was injured was assembled and released by Freightliner's Cleveland, Ohio plant on July 29, 1996. That same month, it was sold to Penske.

In addition to owning FLD 120 tractors, Penske owns several other Freightliner tractors, some of which were eventually sold to CBF in 2002.

Penske is a company which purchases and then leases, rents, or resells trucks from various manufacturers, including Freightliner. Penske buys generic tractors designed by the manufacturer. Penske does not design or manufacture vehicles. Other than performing general maintenance, Penske does not make any modifications to the vehicles after purchase. However, specification books which include all available options which may be added to the tractors, are supplied to Penske by each manufacturer so that on resale customers can be made aware of additional optional features. Upon the resale of a tractor, a Penske salesperson can review the specification books and suggest options that a customer may want to add to the tractor. Similarly, if a customer requests an option, the salesperson can check the book to see if that option is available. If a customer wishes to add an option, Penske relays that information to the manufacturer and the manufacturer modifies the tractor to the customer's specification.

CBF, a trucking company that leases and owns trucks as part of its business, is a frequent Penske customer. In January, 2001, CBF agreed to lease from Penske forty-five tractors for two years with an option to buy the used equipment on a "Try-Me Lease Program." Under this program, customers who did not want to purchase new equipment could lease or purchase used equipment from Penske. Edmund Hafner ("Hafner") was the Penske salesperson who negotiated the lease and eventual sale of the forty-five tractors to CBF.

CBF was looking to lease forty-five single axle tractors manufactured by Freightliner. CBF did not request any additional features, nor did Hafner suggest any. The tractors that CBF purchased were all model FLD 120 tractors that were manufactured before 1997. Some of the

tractors had a step off of the tractor's battery box, but some did not.

During the lease period, Penske performed all the maintenance on the forty-five tractors. On several occasions, Penske serviced the tractor which Walter was using when he was injured. On at least one occasion, Penske performed maintenance in the area of the battery box. After the sale of the trucks, CBF was responsible for maintaining the vehicles.[1]

Walter was employed as a truck driver at CBF at the time of his injury. One part of Walter's responsibilities as a truck driver was to attach the trailer to the back of his assigned tractor and hook up the hoses from the tractor to the trailer. In order to do this, the driver must have access to the back of the tractor's cab.

To provide stable access to the back of the cab, "three point contact" is necessary at all times. "Three point contact" means that a driver must have either two feet and one hand or two hands and one foot on the tractor at the same time. The manufacturer creates "three point contact" by mounting a grab handle to the back of the cab, which a driver can hold on to when climbing onto the rear of the tractor. Generally, the tractor's battery box is located behind the cab in the same area where the driver accesses the hose hookup. Drivers can stand on the battery box while attaching the trailer and hoses to the tractor. Some tractors have a step below the battery box to make it easier for truck drivers to maintain "three point contact" while accessing the back of the cab.

Prior to 1997, a step below the battery box was an optional feature on Freightliner's model FLD 120 tractors. Purchasers could request this step but it was not a standard feature.

---

[1]On April 8, 2002, approximately eight months before the two year lease period was up, CBF decided to purchase the forty-five tractors.

Freightliner's specification book listed the battery box step as a special feature which could be added at any time.  During the 1997 model year, Freightliner moved the fuel tank which is located in front of the battery box 1/2 an inch forward.  As a result of this modification, Freightliner began installing a step below the battery box as a standard feature on all of its model FLD 120 tractors.

Walter's regularly assigned tractor had a step below the battery box.  On May 11, 2005, Walter's usual assigned vehicle was undergoing maintenance, and Walter was assigned a replacement vehicle.  Walter's replacement vehicle did not have a step below the battery box.  Rather, this truck had a step below the fuel tank.  While descending from the back of the replacement tractor's cab, Walter fell from the battery box and injured his shoulder.

The Medleys allege that Walter's fall and subsequent injuries occurred because there were not a step off the battery box of the tractor that was assigned to him on the day of the incident.  Penske moves for summary judgment on the grounds that it is not responsible for the Medleys' injuries because Freightliner designed, manufactured, and sold the vehicle and because the placement of the steps around the battery box was Freightliner's decision.

## II.  DISCUSSION

### A.  Standard of Review for Summary Judgment under Rule 56(c)

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under

governing law." Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

On a summary judgment motion, the moving party has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine fact issue exists and a trial is necessary.  Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just simply create "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  If there are no issues that require a trial, then judgment as a matter of law is appropriate.

**B.  Negligence and Breach of Warranty Claims**

Penske submits that the Medleys' negligence and breach of implied warranty claims should be dismissed because the New Jersey Product Liability Act is the exclusive remedy for personal injury claims arising out of product use.  Because New Jersey law no longer recognizes negligence or breach of an implied warranty as a viable separate claim for harm caused by a

defective product, the Medleys' negligence and breach of implied warranty claims will be dismissed. Tirrell v. Navistart Intern., Inc., 248 N.J. Super. 390, 398 (App. Div. 1991).

The New Jersey Product Liability Act establishes the sole method of prosecuting a product liability action. Tirrell, 248 N.J. Super. at 398. Under N.J. Stat. Ann. § 2A:58C-2, "a manufacturer or seller of a product shall be liable in a product liability action only if the plaintiff proves by a preponderance of the evidence that the product causing harm was not reasonably fit, suitable or safe for its intended purpose." (Emphasis added). Since § 2A:58C-2 describes the sole method for bringing a product liability claim, and a "product liability action" encompasses "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim," N.J. Stat. Ann. § 2A:58C-8 (emphasis added), it is clear that all other claims are subsumed by the statute. Tirrell, 248 N.J. Super. at 398.

In order for an action to fall within the Product Liability Act, both the harm and the claimant must meet the definitional requirements of the statute. Under the Act, a claimant is anyone who brings a product liability action. N.J. Stat. Ann. § 2A:58C-1(b)(1). Thus, the Medleys are claimants for purposes of the Act. A claim falls within the Act if the plaintiff alleges that a product caused him harm, by causing:

> (a) physical damage to property, other than to the product itself;
>
> (b) personal physical illness, injury or death;
>
> (c) pain and suffering, mental anguish or emotional harm; and
>
> (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph.

N.J. Stat. § 2A:58C-1(b)(2); See also, Potasora ex rel Gray v. Grip, 319 N.J. Super. 386, 401

(App. Div. 2003).  In their complaint, the Medleys allege physical injury, pain and suffering, as well as loss of future wages and consortium.  Since all of the Medleys' harm was allegedly caused by a defective product– the lack of stairs around the battery box of the tractor– their claim falls within the Product Liability Act.

Because the Medleys have stated a claim under the Products Liability Act, all other claims relating to harm caused by the product must be dismissed.  Tirrell, 248 N.J. Super. at 398. In Tirrell, a worker, who was run over and killed by a tractor trailer that was operated by a fellow employee, brought claims of negligence, breach of warranty, strict liability, and gross negligence against the manufacturer of the flat bed trailer.  248 N.J. Super. at 395, 397.  Upholding the dismissal of the negligence and warranty claims, the court concluded that the claims were subsumed by the Product Liability Act.  Id. at 398.  See also, Levey v. Yamaha Motor Corp. U.S.A., 361 N.J. Super. 312, 317 (App. Div. 2003) ("A claim that a product seller has failed to provide adequate warnings . . . is now governed by the Product Liability Act."); Port Auth. v. Arcadian Corp., 189 F.3d 305, 313 (3d Cir. 1999) ( "Under [the Product Liability Act] negligence is no longer viable as a separate claim for harm caused by a defective product.").  Because the Product Liability Act covers all product injury, irrespective of theory, the Medleys' claims of common law negligence and breach of warranty are subsumed by the statute and are therefore, must be dismissed.

**C. The Product Liability Act Claim**

Penske also seeks summary judgment on the strict liability claim brought by the Medleys under the New Jersey Product Liability Act.  Penske asserts that summary judgment is appropriate because it is a "product seller" and, having filed an affidavit naming Freightliner as

the manufacturer of the tractor, Penske falls within the Act's exception to liability.  Although Penske did file an affidavit naming Freightliner as the manufacturer, a question of fact still exists as to whether or not Penske knew or should have known about the alleged defect in the tractor which caused Walter's injuries.  As such, Penske's motion for summary judgment on the Medleys' product liability claim will be denied.

The New Jersey Product Liability Act provides that a manufacturer or product seller shall only be held liable in a product liability action if the claimant proves by a preponderance of the evidence that the product causing harm was not reasonably fit, suitable or safe for its intended purpose because it:

(a) deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or

(b) failed to contain adequate warnings or instructions, or

(c) was designed in a defective manner.

N.J. Stat. Ann. § 2A:58C-2.

Liability, under the Act, is limited to manufacturers and product sellers.  A manufacturer is "any person who designs, formulates, produces, creates, makes, packages, labels or constructs any product or component of a product."  N.J. Stat. Ann. § 2A:58C-8.  A product seller is "any person who, in the course of a business conducted for that purpose: sells, distributes, leases . . . markets, repairs, maintains or is otherwise involved in placing a product in the line of commerce."  N.J. Stat. Ann. § 2A:58C-8.  Because Penske is involved in selling, leasing, repairing, and maintaining Freightliner tractors, it is uncontested that Penske is a product seller and therefore, may be held liable under the Product Liability Act.

In certain circumstances, a product seller may be relieved of liability for injuries caused by a defective product.  N.J. Stat. Ann. § 2A:58C-9.  First, a product seller must file an affidavit identifying the manufacturer of the product.  N.J. Stat. Ann. § 2A:58C-9; Claypotch v. Heller, Inc., 360 N.J. Super. 472, 483 (App. Div. 2003).  Although the purpose of § 2A:58C-9 is to reduce litigation costs borne by innocent retailers in product liability actions, a retail seller will only be relieved of liability under § 2A:58C-9 if it is shown to be truly innocent.  Claypotch, 360 N.J. Super. at 483.  Therefore, a product seller's exemption from liability is contingent upon subsection (d).  A product seller will still be held liable, despite its having identified the original manufacturer, if:

> (1) The product seller has exercised some significant control over the design, manufacture, packaging, or labeling of the product relative to the alleged defect in the product which caused the injury, death or damage; or
>
> (2)  The product seller knew or should have known of the defect in the product which caused the injury, death or damage or the plaintiff can affirmatively demonstrate that the product seller was in possession of facts from which a reasonable person would conclude that the product seller had or should have had knowledge of the alleged defect in the product which caused the injury, death or damage; or
>
> (3) The product seller created the defect in the product which caused the injury, death or damage.

N.J. Stat. Ann. § 2A:58C-9.  Thus, a party's entitlement to dismissal under subsection (b) is dependant upon the party's not being subject to liability under the provisions of subsection (d). Harbour Cove Marine Services, Inc., v. Rabinowitz, 2005 U.S. Dist. LEXIS 34835 *14 (D.N.J. May 3, 2005).  The burden is on the defendant seeking to take advantage of the protections of subsection (b) to establish that the provisions of subsection (d) do not apply.  Id. at *12.

As a product seller, Penske is entitled to seek relief from liability under N.J. Stat. Ann. §

2A:58C-9 by filing an affidavit certifying the correct identity of the manufacturer of the product which allegedly caused the injury.  Penske has filed an appropriate affidavit, naming Freightliner as the manufacturer of the tractor, as Exhibit #6 of its motion for summary judgment.  However, Penske does not address subsection (d) directly.  As a moving party that will not have the burden of proof at trial, Penske's burden on summary judgment is to demonstrate to the Court that the record does not contain evidence of an essential element of the Medleys' case.  This requires demonstrating to the Court that the Medleys lack evidence to prove Penske's liability under subsection (d), which Penske has failed to do.

In order to hold a product seller liable, subsection (d)(1) mandates that the product seller exercise some significant control over the design, manufacturing, packaging, or labeling of the product, relative to the defect.  However, Penske does not have control over the type of tractor that Freightliner manufactures.  Because Penske purchased the standard model tractors from Freightliner, Penske did not have control over whether the tractors would be fitted with a step below the battery box.  Further, the Medleys do not allege that Penske asked Freightliner not to include stairs on the tractors.  As such, Penske cannot be said to have exercised significant control over the design of the product.

Similarly, subsection (d)(3) does not apply.  The Medleys have not alleged that Penske altered the tractors thereby creating the alleged defect and the record contains no evidence that Penske has altered the tractors.  Therefore, Penske did not create the defect and cannot be held liable under subsection (d)(3).  Thus, the only subsection under § 2A:58C-9(d) relevant to Penske is (d)(2).

The Medleys argue that Penske is liable under subsection (d)(2) because Penske knew or

should have known about the tractor's defect, i.e. the lack of stairs around the battery box.  In the

1997 model year, Freightliner moved the fuel tank 1/2 an inch and, as a result, a step off the

battery box became standard.  (Ritchie Dep. 59:9-60:15.)  Previously, adding a step off the battery

box was available as an option.  This option was available at the time that Penske leased and later

sold the trucks to CBF Trucking. (Ritchie Dep. 32:18-20.)  Norm Ritchie ("Ritchie"), a custom

engineering cab supervisor at Freightliner, testified that Penske would be given electronic versions

of Freightliner's sales data book which included this option and all of Freightliner's published

options.  (Ritchie Dep. 14:16-25.)  Further, Ritchie stated that typically, a consumer wishing to

buy a truck would not have access to the specification booklet or the ability to understand its

complexity.  (Ritchie Dep. 34:19-35:7.)

       As such, according to Ritchie, it was the responsibility of the Penske salespeople to read

the sales book for available options and to recommend making changes to the standard model

based on the customer's need as well as the customer's safety.  (Ritchie Dep. 23:11-17; 51:4-8.)

Penske salesperson, Edmund Hafner, also stated that if he believed an option should be added to a

tractor he would suggest it to the customer.  (Hafner Dep. 10:11-11:9.)  However, Hafner did not

bring his specification book to his meeting with CBF regarding the lease of the forty-five tractors.

(Hafner Dep. 34: 3-24.)  Nor did he suggest any changes be made to the standard tractors before

or after completing the sale.  Id.  Hafner, in his deposition testimony, states that he was not aware

that stairs were available as an option and he did not suggest that CBF add them to the tractors

because they were being sold "as is."  (Hafner Dep. 46:19- 47:25.)  Further, Hafner testified that

he was unaware of Freightliner's decision to make the step off of the battery box standard as a

result of the fuel tank being moved 1/2 inch.  (Hafner Dep. 12: 22-13:5.)

Penske does not specifically address any of these issues in its moving papers.  However, at oral argument, Penske argued that it had no notice of a defect and that there is no evidence of a defect.  The issue of whether or not the tractor is defective is not currently before the Court.  As such, the Court will assume until it is shown otherwise that the lack of stairs around the tractor's battery box is a defect for purposes of this summary judgment motion.

Penske also claims that Freightliner had total control over whether a step was standard on the tractor and that Freightliner, as the manufacturer, had the sole responsibility of determining whether to add stairs to the battery box or not.  Once Freightliner was told that back-of-cab access was necessary, Penske asserts that it relied on Freightliner, as the manufacturer, to determine whether or not a stair around the battery box was necessary.  Finally, Penske contends that it does not know of any similar accidents occurring as a result of the battery box stairs.

Under subsection (d)(2), actual knowledge is only one way of creating liability.  Assuming that the Freightliner model FLD 120 tractors were defective, the question becomes whether Penske should have known about the defect or whether Penske was in possession of facts from which a reasonable person could conclude that Penske should have known about the defect.

Since Freightliner made a step off the battery box of the tractor standard during the 1997 model year, the Medleys assert that Penske was, or should have been, aware of that change by 2001 when it signed the lease with CBF.  The Medleys also assert that Penske should have known, based on the change in design, that a tractor without battery box steps is dangerous and defective.  Further, the Medleys argue that Penske should have known that a step could be added to the battery box and that Penske should have known that having a mixed batch of trucks (some with steps and some without) is dangerous.  As such, the Medleys claim that Penske should have

13

suggested stairs be added to battery boxes before selling the trucks to CBF in order to correct the defect.

Alternatively, the Medleys assert that there is evidence demonstrating that Penske was in possession of facts from which a reasonable person would be able to conclude that Penske had or should have had knowledge of the alleged defect in the product which caused the injury. They provide testimony that Penske was in possession of the sales data book which listed battery box steps as an option which could be added to the tractors. (Ritchie Dep. 14:16-25.) They also provide testimony that Penske had the duty to inform customers of the available options. (Ritchie Dep. 23:11-17; 51:4-8.) Because Ritchie testified that no literature was ever published as to why the change was made, the Medleys suggest that Penske should have concluded that the change in design was the result of previous inadequate design and that the older model tractors, lacking a step off of the battery box, were defective. (Ritchie Dep. 64:15-21; 67:17-25; 68:1-8.)

Additionally, the Medleys have submitted a report from their expert, Gabriel Alexander, P.E.. Alexander opines that Penske should have detected and corrected the defective condition that Freightliner created. (Pl.'s Ex. 3 at 18.) Further, he states that by virtue of Penske's access to Freightliner specification materials, Penske should have been aware of the step offerings by Freightliner and, as the party responsible for the ordering and for the sale of the tractors to CBF, it should have passed this critical safety information on to the consumer. Id. Finally, Alexander opines that Penske knew or should have known by virtue of the forty-five trucks that were ordered, that there was a lack of product consistency and the tractors without battery box steps were unreasonably dangerous and defective. Id.

This evidence creates an issue of fact as to whether or not Penske should have known

about the defective tractors based on the information available to it.  As stated by the Appellate

Division in Claypotch, in order to avoid liability, a product seller must demonstrate that the

provisions of subsection (d) do not apply, either by presenting evidence to that effect or by

pointing to a lack of evidence in the record supporting opposite conclusions.  360 N.J. Super. at

483; See also Harbour Cove Marine Services, Inc., v. Rabinowitz, 2005 U.S. Dist. LEXIS 34835

*14 (D.N.J. May 3, 2005) (denying summary judgment and refusing to grant relief from liability

because the defendant did not address subsection (d) in its summary judgment motion on claims

brought against it under the Product Liability Act).  Establishing that the provisions of subsection

(d) do not apply is a necessary element if Penske is to take advantage of the protections of §

2A:58C-9.  Because Penske has failed to meet this burden, its motion for summary judgment will

be denied as to the Medleys' product liability claim.

### IV.  CONCLUSION

For the reasons set forth above, Penske's motion for summary judgment will be granted as

to the Medleys' negligence and breach of warranty claims.  However, summary judgment will be

denied as to the Medleys' product liability claim brought under New Jersey's Product Liability

Act.  The Court will enter an order implementing this opinion.

/s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: July 25, 2008

15